**STATE FARM MUTUAL AUTOMO-
BILE INSURANCE COMPANY,**
a corporation

v.

**Alexander R. WEST, Huret Ralph Pickle,
William Howard Pickle, Edna Gaddis,
and Lessie Gaddis, Administratrix of
the Estate of Nora Gaddis, deceased.**

Civ. No. 8314.

United States District Court
D. Maryland.

Feb. 21, 1957.

22. 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469.

George M. Mullen, Baltimore, Md., Charles C. Collins and Robert E. Anderson, Washington, D. C., for plaintiff.

Charles D. Sanger Jr., Silver Spring, Md., for defendant Alexander R. West. Aulette, Davis, Ogden, Leonard & Cervera, Paul F. Leonard and James A. Davis, Washington, D. C., and Joseph I. Huesman, Baltimore, Md., for other defendants.

R. DORSEY WATKINS, District Judge.

This is an action brought on June 24, 1955, by State Farm Mutual Automobile Insurance Company, an Illinois corporation, against the defendants, Alexander R. West, Huret Ralph Pickle, William Howard Pickle, Edna Gaddis, and Lessie Gaddis, Administratrix of the estate of Nora Gaddis, deceased, all residents of the State of Maryland, for a declaratory judgment that a certain policy of insurance issued by the plaintiff to the defendant West be rescinded as of the date of its issuance. Motions to dismiss were filed on behalf of all defendants, and after passage of an order denying the motions, the case was tried by the court without a jury.

### Motions to Dismiss.

The complaint contained averments of jurisdiction under Title 28 U.S.C. § 2201, alleging diversity of citizenship, and an amount in controversy exceeding the sum of $3,000, exclusive of interest and costs. The complaint in substance alleged that subsequent to receipt of and in reliance upon the statements and representations made in an application for insurance by the defendant West, the plaintiff issued to him an automobile insurance policy; that on or about April 1, 1954, plaintiff received from the defendant West another application for insurance identical in all respects with the first, except that it added an application for a $50 deductible collision insurance provision; and that in reliance upon the statements and representations made therein, plaintiff issued to defendant West an automobile insurance policy which superseded and replaced the policy previously issued. The complaint further alleged that on October 16, 1954, within the State of Maryland, the defendant West, while operating the motor vehicle covered by said second policy, was involved in a collision with an automobile owned by the defendant William Howard Pickle, and operated by defendant Huret Ralph Pickle, said collision resulting in the death of Nora Gaddis, personal injuries to defendants Huret Ralph Pickle and Edna Gaddis, and destruction of the automobile owned by defendant William Howard Pickle; that claims for said death, personal injuries and property damage have been asserted against the plaintiff as the insurer of the defendant West, and that

during the course of the investigation of the accident, plaintiff discovered that the defendant West had made misrepresentations, material to the risk, in both applications for insurance in that he had answered in the negative questions as to whether he had had any prior accidents or whether his operator's license had ever been revoked when, in fact, he had been involved in prior accidents and his operator's license had been revoked in the State of North Carolina in the year 1947 and in the District of Columbia in the year 1952, and that had defendant West correctly answered said questions, plaintiff would not have issued said policies; and that upon learning of these misrepresentations, plaintiff notified defendant West of its decision to rescind the policy issued to him, and tendered its check in full refund of the premium paid, which refund defendant West has refused to accept.

Defendant West moved to dismiss the complaint on the ground that the court lacked jurisdiction because the actual amount in controversy does not exceed $3,000, exclusive of interest and costs. The other defendants filed a motion to dismiss on the ground that there existed no justiciable or actual controversy warranting relief by way of declaratory judgment. At the hearing on the motions, all counsel admitted that there existed diversity of citizenship and that a justiciable controversy existed. Defendant West insisted that the amount in controversy did not exceed $3,000 on the grounds that within the jurisdictional requirement, the amount of $3,000 had to be "certain" and "due at the time" that the suit was filed and that no formal demand had been made upon plaintiff with respect to the policy before suit was filed. Counsel for West also contended that the declaratory judgment act is procedural and that the acceptance of jurisdiction by the District Court is discretionary even if the formal jurisdictional requirements are met, and that the court should exercise its discretion and decline to exercise jurisdiction even if it existed.

At the hearing on the motions, counsel for the plaintiff, without objection, filed certified copies of four suits filed in the Circuit Court for Prince George's county, Maryland, on June 2, 1955, against the defendant Alexander R. West; one by the State of Maryland for the use and benefit of Lassie M. Gaddis as surviving parent of Nora N. Gaddis, deceased, for the recovery of loss of earnings and support of the deceased attributable to the alleged negligence of defendant West, the amount claimed being $50,000; the second by Lassie M. Gaddis, Administratrix of the estate of Nora N. Gaddis, deceased, for the recovery of expenses attributable to the alleged negligence of defendant West, for damages, for physical and mental pain and suffering by the deceased during her lifetime and for funeral expenses, the amount claimed being $50,000; the third by Edna M. Gaddis, infant, by her mother and next friend, Lassie M. Gaddis, and Lassie M. Gaddis, individually, plaintiffs, for permanent injuries and pain and suffering sustained by the infant plaintiff, and for medical expenses of the mother Lassie M. Gaddis in the treatment of the infant plaintiff, the amount claimed on behalf of the infant plaintiff being $25,000 and that on behalf of the mother being $25,000; and fourth, a suit by Huret Ralph Pickle, for permanent injuries and expenses, the amount claimed being $50,000.

The insurance policy which is the subject of this action required the insurer to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages * * arising out of the use of the automobile" and to " * * * defend any suit against the insured * * * seeking damages on account thereof * * *." The contention that the amount in controversy was not certain and due at the time of filing of this suit for declaratory relief or, as otherwise phrased by counsel, that the existence of the requisite jurisdictional amount depends on a future contingency or the "possible collateral effect" of the declaratory judgment is

based on the fact that the insurer is under no obligation to indemnify the insured until judgment has been rendered against the insured in the negligence cases now pending in the State court. This proposition has been raised before and ruled on adversely to the contention of defendant West by the Court of Appeals for the Fourth Circuit (Aetna Casualty & Surety Co. v. Yeatts, 4 Cir., 1938, 99 F.2d 665, 668; American Casualty Co. of Reading, Pennsylvania v. Howard, 4 Cir., 1949, 173 F.2d 924; accord: United States Fidelity & Guaranty Co. v. Pierson, 8 Cir., 1938, 97 F.2d 560, 562). As the court said in the American Casualty case, supra, 173 F.2d at page 929:

> "We are also told that the issues involved, as to Elias Howard [insured] and Casualty [insurer], in the Survival Statute action are moot, hypothetical and conjectural; for, if judgment in that case should be in favor of defendant, then there would be no issue in that connection between Elias Howard and Casualty. But no one can now accurately foretell just how such a judgment will go. And, further, as we have already pointed out, Casualty is vitally interested (so is Elias Howard and, in a minor measure, the Administrator) in knowing, before the trial of that action, just what, if any, its rights and liabilities therein are or may be, so that, in the light of this knowledge, Casualty can determine just what course of conduct it should, or must adopt."

Stockman v. Reliance Life Insurance Co. of Pittsburgh, Pa., D.C.W.D.S.C., 1939, 28 F.Supp. 446, and Berlin v. Travelers Insurance Co. of Hartford, Conn., D.C.D.Md.1937, 18 F.Supp. 126, relied on by defendant, are clearly distinguishable both factually and on their holdings that in an action to recover monthly payments due under disability insurance the benefits accrued and claimed as of the time of suit constituted the amount in controversy, and not the reserves which the insurer would be required to set up for future payments, liability for which the insured might be estopped from denying, such matters being merely a collateral, consequential or incidental result of the judgment. Where, as here, the insurer is seeking to determine not only whether or not it is obligated to defend West but also whether or not it must indemnify him under an insurance policy with limits of liability of $25,000 for bodily injury including death sustained by one person in any one accident; $50,000 for bodily injury including death sustained by two or more persons in any one accident; $5,000 for property damage; and $1,000 for medical payments; and when suits are pending against him claiming damages totaling $200,000, the amount in controversy is sufficient to meet the jurisdictional requirements.

The point is urged that no formal demand was made upon the insurer with respect to the policy before this suit was filed on June 24, 1955.[1] This is merely another way of saying that the issues in this case are hypothetical, conjectural and premature. The policy requires no formal demand as a condition precedent to the insurer's obligation to defend and indemnify its insured. It does, however, provide that the insured shall give written notice as soon as practical of any accident and shall immediately forward to the insurer every demand, notice, summons, or other process received, by the insured. Any failure by insured to comply with these terms of the policy relieves the insurer of liability, a defense upon which the insurer is not relying in this case. Between November 23, 1954 and November 26, 1954 defendant West accepted a total of $1,051.15 covering various claims he made under the policy. From October

---

1. A letter was written on July 14, 1955 by West's counsel to the plaintiff advising that a failure to defend the suits against West would be considered a breach of contract.

21, 1954 through March 2, 1955, the plaintiff was in communication with the attorney for the defendants other than West relative to their special damages. While it might be argued that after the notice to West under date of April 25, 1955 of the rescinding, as of the date of their issuance, of the superseded policy and the policy in suit the situation changed in that some indication of opposition to the legal position taken by the insurer would be a prerequisite to the bringing of this suit, this indication is found in West's refusal to accept the insurer's check tendered in full refund of the premium paid and in his continuing to hold the sums paid him in November, 1954. Moreover, on May 11, 1955 when the attorney for the defendants other than West was informed by the insurer of its action, defendants' counsel made it clear that the necessary steps, including the appointment of Mrs. Lassie[2] Gaddis as administratrix of the estate of Nora Gaddis, deceased, would be taken to institute suits against defendant West, and four such suits were subsequently filed in the State court on June 2, 1955. Under the terms of the policy in question any person or legal representative thereof who secures a judgment against the insured is thereafter entitled to recover under the policy to the extent of the stated insurance. When on June 24, 1955 the insurer brought this action for declaratory relief clearly there was in existence an actual controversy within the meaning of 28 U.S.C. § 2201.[3]

A motion to dismiss based not on lack of jurisdiction under the Federal Declaratory Judgments Act but rather on the impropriety of exercising that jurisdiction is a motion addressed to the discretion of the court (Brillhart v. Excess Insurance Co. of America, 1942, 316 U.S. 491, 494, 62 S.Ct. 1173, 86 L.Ed. 1620; Aetna Casualty & Surety Co. v. Quarles, 4 Cir., 1937, 92 F.2d 321,

324). American Casualty Co. of Reading, Pennsylvania v. Howard, 4 Cir., 1949, 173 F.2d 924, at pages 927–929, wherein the plaintiff insurance company sought, as to its obligations under an automobile liability policy, a declaratory judgment against its insured, the operator of its insured's automobile, the Administrator of the estate of the person whose death resulted from the accident, and the deceased's beneficiaries under the applicable wrongful death act, is directly in point, the principles controlling being clearly set out as follows:

"'As said by Judge Knight in the case of Automotive Equipment Co. [Inc.] v. Trico Products Corporation, [D.C.W.D.N.Y.1935, 11 F. Supp. 292] however, the discretion to grant or refuse the declaratory relief 'is a judicial discretion, and must find its basis in good reason,' and is subject to appellate review in proper cases. We think that this discretion should be liberally exercised to effectuate the purposes of the statute and thereby afford relief from uncertainty and insecurity with respect to rights, status and other legal relations * * *.'

"\* \* \* \* \* \*

"Casualty [insurer] is not, and cannot be, a party to the action instituted by the Administrator [claimant] against Elias Howard [insured] under the Survival Statute. And nowhere in the State Court is there pending any litigation involving the duty of Casualty to defend that action and to pay any judgment that might be recovered therein. Cf. Indemnity Ins. Co. [of North America] v. Schriefer, 4 Cir., 142 F.2d 851; Aetna Casualty & Surety Co. v. Quarles, 4 Cir., 92 F.2d 321; Maryland Casualty Co. v. Boyle Construction Co., 4 Cir., 123 F.2d 558. So there are

2. Incorrectly spelled Lessie in the complaint.

3. These facts readily distinguish this case

from National Farmers Union Property & Casualty Co., D.C.W.D.Okl.1956, 142 F.Supp. 650.

issues involved in that connection which can (*and should*) be settled in the instant action for a declaratory judgment." (Emphasis supplied.)

The appropriateness of declaratory relief where the issue in question is the coverage or validity of an insurance policy is well recognized, such an action being easily differentiated from one which is brought merely to try some of the issues involved, the result being piecemeal litigation of the controversy; or one brought to determine the validity of defenses already asserted, and equally capable of being determined, in pending suits.

The court has also considered the effect of Article 75, section 158 of the Code of Public General Laws of Maryland, 1951 Edition, as amended, on the plaintiff's ability to obtain relief in the state courts. Section 158, "applicable in equity as well as in law" was enacted "to afford residents of the State an opportunity to avoid the defense of actions in counties distant from their homes or places of employment." (Zouck v. Zouck, 1954, 204 Md. 285, 291, 104 A.2d 573, 575, 105 A.2d 214) by providing that no one shall, with certain exceptions not pertinent here, be sued out of the county in which he resides or habitually engages in employment. From the record it is at least questionable if defendant West and the injured defendants would be subject to suit in the same county. The plaintiff would, to obtain complete relief in the State courts, have to file at least two suits for declaratory judgment for, as will be discussed elsewhere in this opinion, the injured defendants claim by way of estoppel rights independent of, and superior to, those claimed by defendant West so that a judgment in favor of the plaintiff as against West would not, of necessity, be binding on the injured defendants.

For the foregoing reasons the motions to dismiss were denied.

### Merits.

Plaintiff claims that the policy in question and the one superseded were issued in reliance upon materially false representations made in each application by defendant West. Defendants deny that such misrepresentations were made; and in the alternative claim that plaintiff has either waived, or is estopped to assert, any right to rescind the policy.

### Facts.

On or about March 2, 1954, defendant West's application for automobile liability insurance was taken by plaintiff's local agent Stearns at West's home. There were present Stearns, West and his wife. The application contained a number of printed questions, including no. 16 which called for the dates of accidents in which the applicant (and any listed additional driver) had been involved; and no. 18, "Has operator's license or registration for any driver been suspended or revoked?" At the end of question 18 was a box in which "yes" or "no" could be checked.

Stearns testified unequivocally both on direct and cross-examination, that all questions eliciting information from the applicant, and specifically questions 16 and 18, were asked and that the answers shown on the application were those given by West. West testified that only four questions were asked him; viz., his name, address, how he had acquired such a good automobile so cheaply, and his age. West then added that he had also been asked if he had ever had his "license revoked." He quickly changed this as a slip of the tongue, saying he meant that he had been asked if any insurance policy had ever been revoked and his answer was "no" as he had never had any previous policy.

West's wife testified that she was present during the interview on March 2, 1954 and that "as I remember, he (Stearns) did not ask all the questions" but she did not "pay that much attention". She further stated that she did not believe that the application contained any questions as to prior accidents, can-

cellation of insurance or suspension or revocation of operator's license.

At the conclusion of the interview, the application was handed to defendant West who testified he signed it without having read the questions and answers, although he had had an opportunity to do so.[4] The application, offered in evidence, gave the answer "none" to the question as to accidents, and a check-mark under the "no" box in answer to the question as to suspension or revocation of operator's license or registration.

On the conflicting evidence, considering the appearance and attitude of the witnesses on the stand, the inherent probabilities [5] and the weight to be given a statement signed by a person with ability and opportunity to read it, I find as a fact that questions 16 and 18 were read to defendant West, that he answered them, and that the answers given by him were correctly reported upon the application of March 2, 1954.

Subsequently, West decided to add a $50 deductible collision insurance provision to his policy. A telephone call to this effect was made to Stearns on or about April 1, 1954. On April 17, 1954, a new application, dated April 1, 1954, with answers completed exactly as in the March 2, 1954 application except for the addition of a provision for collision insurance, was mailed by Stearns to West with a covering letter reading in part as follows:

"Dear Mr. West: Please look over this form and see that I have answered the questions correctly and then sign your name on line #20 and attach your check for $22.-73 to insure your car up to Sept. 2 1954., (sic) Then the premium will be due for the six months rate at that time * * * "

The receipt of the April 1, 1954 application is admitted by West and the receipt of the forwarding letter of April 17, 1954 is not denied by him. West testified that this application might have remained in his house more than one day before he signed it and returned it without having read it, although he knew the questions on the application were being asked to determine if he could obtain insurance.

In a diversity case such as this, I am of course bound to apply local law.[6] The decision of the Maryland Court of Appeals in Rossi v. Douglas, 1953, 203 Md. 190, 100 A.2d 3, contains language directly controlling on the facts above stated as to the second application. That court said, 203 Md. at page 199, 100 A.2d at page 7:

"There is no claim here of fraud or duress or mutual mistake, and it is well established that in the absence of these features one having the capacity to understand a written document who reads it, or, without reading it or having it read to him, signs it, is bound by his signa-

---

4. West claimed that he "could not read too well"; that he had not finished the seventh grade. On the stand he read question 18 without any apparent difficulty and stated that he understood what it meant. He also read without hesitation or without any apparent difficulty his applications for driver's licenses in the District of Columbia, Virginia and Maryland, which contained questions as to revocation of operator's license, which he answered in the negative. He also had no difficulty in reading the letter of April 17, 1954, mentioned below, from Stearns forwarding his second application for insurance.

5. Since West had had no hesitation in falsely answering questions as to revocation of his driver's license in his applications for license in the District of Columbia, Virginia and Maryland (the latter having been made on March 9, 1954), and since his wife who was present at the interview did not know until after the accident in question that he had had any traffic difficulties, it is entirely consistent that he would answer that and related questions in the negative when he was applying for insurance.

6. Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188; Ruhlin v. New York Life Insurance Co., 1938, 304 U.S. 202, 58 S.Ct. 860, 82 L.Ed. 1290.

**298**

ture. Spitze v. Baltimore & O. R., 75 Md. 162, 23 A. 307; Columbia Paper Bag Co. [of Baltimore] v. Carr, 116 Md. 541, 82 A. 442; McGrath v. Peterson, 127 Md. 412, 96 A. 551; Western Maryland Dairy [Corp.] v. Brown, 169 Md. 257, 262, 181 A. 468, 471; Gardiner v. Gardiner, [200 Md. 233] 88 A.2d 481; Ray v. William E. Eurice, supra [201 Md. 115, 93 A.2d 272]; Williston, Contracts, sec. 90A; Restatement of Contracts, sec. 70. Indeed Williston says that even if an illiterate executes a deed under a mistake as to its contents, he is bound both at law and in equity if he did not require it to be read to him or its object explained. This is everywhere the rule. Williston, Contracts, sec. 1577."

■■ I therefore rule as a matter of law [7] that the answers contained in the application of April 1, 1954 are binding upon the defendants. I further find as a fact that policy No. 280425–C02–20, in suit, was issued in reliance upon the negative answers to questions 16 and 18 in said application and that had such questions been truthfully answered the policy would not have been issued.[8]

In fact defendant West had, prior to March 2, 1954, been involved in accidents; his license to operate a motor vehicle had been revoked in the State of North Carolina in 1947 and had not been reinstated; and his license to operate a motor vehicle in the District of Columbia had been revoked in the District of Columbia in "1951 or 1952" because of accumulated traffic tickets and a hit-and-run accident. He had made no application for reinstatement in North Carolina, and the time for so doing had expired. He had made an application for reinstatement in the District of Columbia, but the accident in question occurred before action was taken on this application.

On October 16, 1954 West was involved in a serious accident. The file was promptly assigned to John B. Handy, Jr., an experienced adjuster and member of the Bar. On October 20, 1954, Handy interviewed West at Sibley Hospital and obtained a signed five page statement from him. Most of the statement dealt with the events leading up to the accident, the only portion relevant to defendants' defenses appearing in the last paragraph, as follows:

"I have been arrested for reckless driving and being drunk on the street in Wash. D. C. but have never had any charges vs (sic) me in Maryland."

■ In his report of October 21, 1954, transmitting the signed statement, Handy went into considerable detail as to the parties involved, and the nature

---

7. The admissibility in evidence of the applications is discussed, infra.

8. Stearns testified that if, in response to question 16, the applicant had stated that he or any additional driver had been involved in an accident, he would not have completed the application but would have sent in full information to his company on an "inquiry form" for their determination as to whether or not they would accept the application at standard rates, above standard rates, or would decline it. He also testified that if he had known that West's operator's license had been suspended or revoked, he "would not have taken the application" but would have submitted an inquiry form to the home office.

Walton who in 1954 was a "senior underwriter" and at the time of the trial was underwriting superintendent in plaintiff's regional office through which West's applications were processed, testified that if an application had been received at the home office with question 18 answered in the affirmative, it would not have been accepted and that if any binder for insurance was outstanding, it would have been cancelled without investigation and no policy would be issued. The testimony of O'Neill who, as senior underwriter, passed upon West's applications, was that if West's application or any application had stated that the applicant's operator's permit had been revoked, he would not have accepted the application and would have cancelled any outstanding policy.

and extent of potential liability. As to his interview with West,[9] Handy wrote:

"Our insured is a husky, 32 year old white male, who indicated that he had several bones broken in his back and has been informed that he will be in a cast for at least 4 weeks and that surgery may be necessary. We are on this risk for medical payments and hence I provided him with the routine medical report form for completion by Dr. Brady who is handling his case. I got the distinct impression while talking to West that he was lying in his teeth but there was nothing to do but just take down the facts as he poured them forth. You will notice that West alleges that he had a mental blackout from approximately 4:00 in the afternoon until well after the present accident had occurred (approximately 7:15 PM). The insured admits to a police record in the District involving arrests for reckless driving and being drunk as a pedestrian. He denies having been arrested for driving while drunk prior to the present accident. Whether or not the insured's version is true he has told it to the police and to us and now he will ride out on this version all the way to the end and shaking his version can't particularly help our liability under this case. This amnesia type alibi may go over in detective fiction but it did not impress the writer when it was put forth by our named insured."

Under date of November 24, 1954, Handy wrote, among other matters:

"This insured admits to a criminal record in the District of Columbia involving drunk and disorderly charges and his community standing appears inadequate."

---

9. Handy had testified that in the regular course of business he made written reports to his superiors of his investigations and that these reports were prepared at or about the time of the act or transaction to which they related. He further testified that in the regular course of business he would attach to such reports various supporting data mentioned therein and that these became part of the report. As such, they would be admissible under 28 U.S.C. § 1732 and Maryland Code of Public General Laws, 1951 Edition, Art. 35, Sec. 68, to the extent that they contained relevant matter. Counsel for all defendants thereupon demanded that counsel for plaintiff deliver to them for examination and possible use either in cross-examination or as direct evidence, all memoranda prepared by Handy from October 21, 1954 relating to the casualty of October 16, 1954. Counsel for plaintiff while recognizing the applicability of the rule above stated, objected to the production of these memoranda on the ground that they contained material not relevant to the declaratory judgment suit and material which might be prejudicial if the damage and death suits were tried. The court thereupon was furnished with the entire file and upon an examination, determined that there was merit in the objection taken by counsel for plaintiff. The court, however, marked and read into the record all portions of the file which, in the court's opinion, had any bearing upon the rescission suit. In the course of reading these extracts into the record, the court stated and counsel for plaintiff conceded that there were numerous references to discussions of possible settlement.

At the conclusion of the whole case, counsel for defendants made the point that had the documents been submitted to them, they might not have read into the record all that was read in by the court. Counsel for plaintiff stated that had only partial excerpts of the portions of the memoranda bearing upon rescission been read, they would have required the reading of the balance. Thus the record would have covered the same material read into it by the court.

The exclusion from examination by counsel for defendants and from inclusion in the record of those portions of the memoranda which the court did not deem relevant to the rescission question was necessarily and expressly without prejudice to the right of defendants to secure or to endeavor to secure access to such data in any other litigation or in any other manner.

Later in the same report, under the heading "Witnesses", Handy stated:

"(a) Alexander Robert West, male, white, 32 years of age, of 10521 St. Paul St., Kensington, Md., was our insured and was unemployed at the time of this accident. A signed statement has been secured from Mr. West and this was taken while he was still a patient at Sibley Hospital. This man will have practically no value at all as a witness because of his moral background and the circumstances under which this accident occurred. His statement of having blacked out for a four-hour period would be almost beyond comprehension."

Under "Desirability of Risk", Handy commented:

"This policyholder is one of the worst risks the the writer had run into but this particular caption has been made moot by the cancellation of this policyholder which I understand took place on or about November 10 of this year." [10]

Between November 23, 1954, and November 26, 1954, plaintiff paid West $505 property damage under the $50 deductible collision coverage; reimbursed him in the amount of $75 for premium on bail bond; and $421.15 was paid for medical and hospital expenses.

At some time, apparently about January 21, 1955, Handy's immediate superior suggested that some investigation be made of West's "criminal record". On January 24, 1955, Handy replied that "criminal record is confidential in D. C." Nothing further appears in the file on this point until March 22, 1955.[11] On that date, or the day before, plaintiff had learned through Retail Credit Bureau that there had been a revocation of West's operator's license prior to March 2, 1954. This was reported to Handy, who secured statements from Stearns and Mrs. West; a copy of West's record from the Maryland Department of Motor Vehicles,[12] and who made a further report of his original interview with West, and of the settlement negotiations. In part his report read:

"In my memo to you of October 21, 1954, which accompanied my preliminary report and under the caption, investigation, I covered the initial work which was done my me. The latter portion of this caption covered my interview with the insured at the hospital. Since it has now come to our attention that the named insured's driving privileges [sic] have been revoked in the District of Columbia prior to and at the time of his application for insurance, I feel that some elaboration on my discussion with the insured should be incorporated in the file. Before interviewing the insured, I checked the police report and ascertained that his Maryland driving license was in force and when I talked to West in the hospital, I specifically remember asking to see both his driving license and his car registration. I specifically remember inspecting both of these papers and finding them to be apparently in full force and effect. It is my recollection that I asked the policyholder if his permit had been revoked and in answer to the question, he said, 'Let me show it to you, it's here on the hospital table in my billfold.' and I did then inspect it.

---

10. On October 28, 1954, plaintiff wrote West it was cancelling the policy effective November 11, 1954, and enclosed a check for the unearned premium. No reason for cancellation was given to West.

11. From October 21, 1954 until March, 1955, Handy had had numerous discussions with the attorney for the defendants other than West relative to special damages and possible settlement. I find as a fact that these were preliminary discussions, and that no definite offer of settlement was made on behalf of plaintiff, and no firm settlement figure was given plaintiff by defendants.

12. Which showed no violations other than those arising out of the occurrence of October 16, 1954.

I did not specifically ask the insured if he had ever had a permit in the District of Columbia and when I developed the criminal record in the District, I remember that the policyholder bragged that although he had been convicted of being drunk on the street that he had never been convicted of drunk driving and otherwise attempted to explain away his record relative to motor vehicles as if it was inconsequential. In retrospect, I should have specifically covered the possibility of a revocation of a D. C. permit but I was operating under the erroneous impression that the Maryland permit was the only one which had ever been held by the insured. Since I was unaware of a D. C. operators permit having been cancelled, I did not make a notation of the effective date of the Maryland permit. It would seem from the statement which I secured from agent Stearns that a definite misrepresentation took place when the policyholder applied for insurance with us specifically in relation to question number eighteen relative to suspension and revocation of operator's license or registration. It would seem obvious that in order to acquire the Maryland permit, if it was secured after the D. C. revocation, that this policyholder must have falsified his permit application to Maryland in order to have been granted this license. It may have been that this policyholder had both permits in full force at the same time and that the D. C. permit was revoked and the Maryland permit remained in force. It is unfortunate that this policy defense comes to our attention at this late date as a possible waiver has taken place since an investigation had been made and an SR21 filed with the State of Maryland.

The policyholder is currently confined to the Maryland House of Correction which is located in Jessup, Maryland on U. S. #1 near the Waterloo Barracks. Since this accident, Mrs. West has given birth to a baby boy and is no longer employed at a beauty shop as a beauty operator although she has secured other employment."

On April 26, 1955, Handy reported that the attorney for defendants other than West had inquired as to possible settlement, and Handy had told him that "our file had been referred to the Home Office for an advisory opinion and that no specific instructions were available to" Handy "relative to the value of the case."

Under date of April 25, 1955, plaintiff wrote West that it was rescinding "as of the date of their issuance" the (superseded) policy issued on the March 2, 1954 application, and the policy in suit, issued on the April 1, 1954 application, and tendered an amount which, together with that tendered at the time of "termination" equalled the entire premium received. The stated grounds of rescission were the false answers in the applications as to previous accidents, and previous revocation of West's operator's licenses.[13]

In addition to the facts above stated, defendants claim (a) that there was a general duty on the part of plaintiff independently to check the answers given by West; and (b) that immediately after the accident of October 16, 1954, plaintiff knew that West's operator's license had been revoked prior to March 2, 1954.

■ (a) Duty to check answers. No authority has been cited by defendants to support the proposition that there existed any "duty" on the part of plaintiff to investigate the answers given in the West applications. On their face,

---

13. The attorney for defendants other than West did not learn of this contention of plaintiff until so informed at a conference about May 11, 1955, called for that express purpose. At that time he announced the intention of suing West, which was carried out by the filing of the four suits on June 2, 1955.

they were entirely plausible, and bore no badge of fraud or deception. Plaintiff's underwriters testified that defendant's stated occupation was one as to which plaintiff's experience was average or better than average, and that in view of the answers given, there was no occasion to obtain a report by independent investigation, and that it was not the practice to do so.[14]

The court is not aware of any legal obligation on the part of an insurance carrier to assume that all applicants are untruthful and dishonest, and that no reliance can be placed upon anything they say.[15] Stated differently, the court cannot conceive of a legal duty owing to defendant West to distrust him; or that the reliance by plaintiff on West's answers was a breach of duty toward *him*.

Moreover, any ordinary investigation would not have disclosed the falsity of West's answers. An inquiry of the Maryland Department of Motor Vehicles would have showed that West held an operator's license and registration card, and that there was no record of any traffic charges or convictions against him in Maryland.

Also, on applications [16] of Mrs. West for insurance, dated August 10, 1954, on which West was listed as an additional driver, a "routine report" was ordered from one of the three independent investigating companies regularly used by plaintiff. The report, which according to custom covered the additional driver (West) as well as the applicant, is dated September 1, 1954, and was apparently based upon interviews with persons who had known the drivers for 2, 3 and 5 years. Both Mr. and Mrs. West were reported as having "compe-

tent driving habits" and were not "criticized for drinking."

I therefore find as a fact and conclude as a matter of law that prior to October 16, 1954 plaintiff had no knowledge, and was not chargeable with knowledge, of any inaccuracy in the answers given by West in the two applications; that plaintiff was under no duty to investigate the truth or falsity of such answers; and that the greater probability is that any ordinary investigation would have failed to disclose the inaccuracies.

(b) Knowledge of revocation acquired after October 16, 1954.

Defendants contend that plaintiff learned on October 22, 1954 that West's operator's license had been revoked prior to March 2, 1954, or was put on such notice that plaintiff was obligated to investigate and learn that fact. This is based in part upon a single answer in Handy's pretrial deposition taken on June 1, 1956; and one statement by Stearns of what Handy purportedly told him. In his deposition, Handy first said that on October 22, 1954, West had told him that there had been certain drunk and disorderly charges against him in the District of Columbia, but not from situations where he was in an automobile, and that West made no statement regarding violations or charges growing out of the operation of an automobile. Later in the deposition he said that West said he had a "conviction for reckless driving"; that it was in West's signed statement. Immediately thereafter, and without prompting, he reverted to his original statements that West did not tell him his license had been previously revoked; West mentioned reckless driving, and being picked

---

14. When the applications were received, they were given the usual treatment accorded new applications. Plaintiff's files were checked to see if there were any previous record on West or his family. This would have covered plaintiff's own experience, and also any report of previous cancellations received from a national reporting company.

15. If such were the law, the inclusion of questions in the application would be worse than meaningless.

16. Two applications were made simultaneously because there was a substantial encumbrance on the vehicle. Because of this, and because the experience with risks in Mrs. West's profession was below average, a report was ordered.

up for being drunk, but that had not involved an automobile.[17]

Handy while on the stand said that the second deposition statement was in error—that he should have used the word "charge"[18] instead of "conviction."

Stearns at a time he vaguely fixed as October, 1954, said that he had a conversation with Handy and:

"To the best of my knowledge, as I recall it, Mr. Handy did not expound on the details of the accident, or, I should say, previous driving history, but he merely pointed out that he had a previous history of having had a license revoked and suspended. That is the general—"

The interruption noted in the quotation was occasioned by a bench conference requested by defendants' attorneys. This line of questioning was not then resumed, but later when pressed by defendants' counsel as to exactly what was said, Stearns could recall nothing other than that Handy had taken a statement from West, and that West had a traffic record.[19]

---

17. The exact deposition questions and answers are as follows:
"A. The first time that I obtained any information as to a criminal record for Alexander R. West was on the 22nd of October 1954 when I interrogated Mr. West in his hospital room at Sibley Hospital.
"Q. What information did you then obtain from Mr. West concerning that record? A. Mr. West admitted in the statement that I took from him that he had certain drunk and disorderly charges against him in the District of Columbia, and he went on further to state that these drunk charges never resulted from situations where he was in an automobile. That statement was made after the formal statement had been concluded.
"Q. When did he make any statement to you regarding violations or charges growing out of the operation of an automobile?
"Mr. Collins: If he made any.
"A. He made no statement to me about charges growing out of accidents or otherwise.
* * * * *
"Q. Did I understand you to testify a while ago at the outset of this deposition that you talked to West in the hospital following the alleged collision in October of '54? A. That is correct.
"Q. And that at that time he made no mention to you of any traffic record of his? A. That is correct.
"Q. You are quite clear about that. A. I am sure that he mentioned no traffic record to me. Now, just a minute— he said, and it's in the statement, that 'I have a conviction for reckless driving'.
"Q. Did he tell you his permit had been revoked in North Carolina? A. He did not tell me that his permit was revoked.
"Q. Or that it had been revoked in the District of Columbia? A. He did not tell me that.

18. As he did in his October 21, 1954 and March 22, 1955 reports.

19. "I believe you also stated, when Mr. Sanger was questioning you, that you had discussed the traffic record of Mr. West with Mr. Handy some time in October, 1954. A. It was merely pointed out to me that he had a traffic history or traffic record.
"Q. Do you recall exactly what Mr. Handy said to you at that time? Do you recall his exact words? A. No, I don't.
"Q. Was there anybody else present when you had that conversation with Mr. Handy? A. When I saw him, there may have been other people in the office, other agents.
"Q. Were they at your desk? A. No.
"Q. And the discussion was held in your office in Silver Spring? Is that correct? A. To the best of my knowl-

"Q. That's all he told you about his traffic record at that time? A. Two things—reckless driving, and then after the statement had been completed that although he had been picked up for being drunk, that never involved an automobile. Those two statements.
"Q. And that's all he told you regarding his traffic record. A. That is correct."
West's signed statement to which Handy referred as the statement to which he was testifying, was:
"I have been arrested for reckless driving and being drunk on the street in Wash. D. C. but have never had any charges vs me in Maryland."
West was called as a witness by both plaintiff and defendants, but was not interrogated as to his signed statement, nor as to what was said at the conference of October 22, 1954.

■ In view of the signed statement of West, the written reports by Handy of October 21, 1954 and March 22, 1955, and the demeanor of the witnesses on the stand, I find as a fact that plaintiff did not at any time prior to March 21, 1955 know that West had had an operator's license revoked prior to March 2, 1954. Had such knowledge been obtained, it is incredible that an experienced adjuster would not at once have recognized its importance, and promptly have reported it to his employer.[20]

## Questions of Law.

(1) Are the applications admissible as evidence of defendant West's misrepresentations and the plaintiff's reliance thereon?

Line twenty of both applications for the policies the plaintiff seeks to have rescinded contains, immediately above defendant West's signature, the following provision:

"The undersigned hereby applies for the insurance indicated above and represents he is the owner of the described automobile and that the statements herein are correct."

Defendant asserts the legal effect of this provision is controlled and altered by paragraph twenty-one contained in both policies stating:

"By acceptance of this policy the named insured agrees [1] that the statements in the declarations are his agreements and representations, that this policy is issued in reliance upon the truth of such representations and [2] that this policy embodies all agreements existing between himself and the company or any of its agents relating to this insurance."

The declarations, printed in part and typed in part, set out most of the statements made in the application but omit any reference to the drivers of the car, their physical defects, prior accidents, or suspension or revocation of driver's license or registration. While it is true that the first part of paragraph Twenty-one specifies that the policy is issued in reliance upon the truth of *certain representations* of the insured, it does not negate or exclude the existence of *other representations* relied upon by the insurer. "It is often agreed by the parties to the contract of insurance that *certain representations* or promises contained in the policy itself, or incorporated in it by proper reference, shall constitute warranties, upon the truth or fulfillment of which shall depend all rights of the insured in the policy." (Vance on Insurance, 3rd Edition, Sec. 81, pp. 408–409. Emphasis supplied). This court is not expressing any opinion as to whether or not the language of paragraph Twenty-one of the policies in suit would be construed under Maryland law to constitute as warranties all of the statements in the declarations. Judge Chesnut in Manufacturers Casualty Insurance Co. v. Roach, D.C.D.Md. 1939, 25 F.Supp. 852, 854, held that statements in the declarations of an automobile liability policy relating to address of insured, the place of principal garaging and the place of principal use were in the nature of present and promissory warranties.[21] Misrepresentations in applications incorporated by reference in life insurance policies should be distinguished. See Jeffries v. Life Insurance Co., 1874, 22 Wall. 47, 89 U.S. 47, 53, 56, 22 L.Ed. 833; Mutual Life Insurance Co. v. Mullan, 1908, 107 Md. 457, 461, 69 A. 385; Art. 48A, Section

---

edge, it was general information that he had seen Mr. West and that he had known that he was injured, and had taken a statement from him.

"Q. And that Mr. West had a traffic record? Is that correct? A. Yes.

"Q. And that was the first knowledge you had of Mr. West's traffic record? A. That is true."

20. Probably with language highly complimentary of his own worth and competence.

21. See also: Ettman v. Federal Life Insurance Co., 8 Cir., 1943, 137 F.2d 121, 126, certiorari denied 1943, 320 U.S. 785, 64 S.Ct. 193, 88 L.Ed. 472, rehearing denied 1943, 320 U.S. 815, 64 S.Ct. 265, 88 L.Ed. 492.

171 of the Code of Public General Laws of Maryland, 1951 Edition, as amended. "As previously shown, a representation or promise will only be given the effect of a warranty when it forms a part of the contract of insurance. In order to become a part of the contract, it must be contained in the policy itself, or expressly incorporated therein by reference. A representation, on the other hand, while constituting an inducement to the contract, is collateral to it, and not only need not be made a part of the contract, either actually or by reference, but may be contained in some paper totally disconnected with the policy, or may even be oral. Manifestly, therefore, no difficulty can arise in construing as representations statements or promises which form no part of the contract." (Vance on Insurance, 3rd Ed., Sec. 73, p. 412–413).

"The very nature of representations requires that they precede the execution of the contract which they are made to induce. They may subsequently be set forth in the written contract, but if proper representations and not the so-called promissory representations, they do not become any part thereof, because not contractual in nature. Being, therefore, merely collateral inducements to the contract, they may be communicated in any manner whatsoever that is intelligible. They may be oral, or written in papers not connected with the contract, such as circulars and prospectuses, *or in the application* or examiner's report, or they may appear in the policy itself." (Vance on Insurance, 3rd Ed., Sec. 67, p. 383. Emphasis supplied).

 The court has no difficulty in holding that the answers in the applications were representations made by West to the plaintiff. A material misrepresentation made by an applicant for insurance, in reliance on which a policy is issued to him, renders the policy voidable as against the applicant and all who stand in no better position, whether such misrepresentation be made intentionally, or through mistake and in good faith (Silberstein v. Massachusetts Mutual Life Insurance Co., 1947, 189 Md. 182, 55 A.2d 334; Baker v. Continental Casualty Co., 1953, 201 Md. 464, 474, 94 A.2d 454; Hancock Mutual Life Insurance Co. of Boston, Massachusetts, v. Adams, 1954, 205 Md. 213, 221, 107 A. 2d 111; A. L. I. Restatement, Contracts, sec. 476). Where evidence of bad faith or falsity or materiality is uncontradicted or clear and convincing, the court may so rule as a matter of law. The court, already having found as a fact that the negative answers to questions 16 and 18 in the applications were material, false, and relied upon by the insurer in issuing the policies, so rules as a matter of law.

 The second half of paragraph Twenty-one is expressed in the terms of the so-called "merger" or "integration" clause. It is used most commonly in contracts where one of the parties is acting through an agent. Its purpose is to limit the agent's apparent authority to vary the terms of the written contract and to preclude the defense of fraud by the other party based on misrepresentations by the agent prior to or contemporaneous with the execution of the written contract. It is ineffectual to exclude evidence of the latter type (Williston on Contracts, Revised Edition, Vol. 3, sec. 811 A. pp. 2281–2285). The Maryland Court of Appeals, in interpreting such a clause in a recent case, has said:

"As Professor Corbin points out in an article on *The Parol Evidence Rule,* in 53 Yale Law Journal 603, at page 621, even such a clause itself may embody a recital of fact which may be untrue. Doubtless, however, such a clause strengthens, and it may go beyond, the presumption of integration upon which the parol evidence rule proceeds; but it is not invariably conclusive and its coverage is a matter of interpretation." (Rinaudo v. Bloom, 1956, 209 Md. 1, 9, 120 A.2d 184, 189).

As this clause does not preclude the insured, when suing on an insurance pol-

icy, from raising the issue of fraud in the inception of the contract (Dulany v. Fidelity & Casualty Co., 1907, 106 Md. 17, 34, 66 A. 614; Eureka-Maryland Assurance Corporation v. Santo Scalco, 1930, 158 Md. 73, 74, 148 A. 267), it should not be construed to bar the insurer from raising the same issue in an action to rescind the policy. Accordingly, the court holds that the applications are admissible as evidence of defendant West's misrepresentations and the plaintiff's reliance [22] thereon.

(2) Does the doctrine of estoppel or of waiver apply as against the plaintiff so as to defeat its right to rescind?

The Maryland Court of Appeals has distinguished and defined waiver and estoppel as follows, citing 40 Cyc. 255:

" 'While waiver belongs to the family of estoppel, and the doctrine of estoppel lies at the foundation of the law of waiver, they are nevertheless distinguishable terms. * * Waiver is the voluntary surrender of a right; estoppel is the inhibition to assert it from the mischief that has followed. Waiver involves both knowledge and intention; estoppel may arise where there is no intent to mislead. Waiver depends upon what one himself intends to do; estoppel depends rather upon what he causes his adversary to do. Waiver involves the acts and conduct of only one of the parties; estoppel involves the conduct of both. A waiver does not necessarily imply that one has been misled to his prejudice or into an altered position; an estoppel always involves this element. * * * Estoppel may carry the implication of fraud, waiver does not. A waiver may be created by acts, conduct or declarations insufficient to create a technical estoppel.' " (Benson v. Borden, 1938, 174 Md. 202, 219, 198 A. 419, 427).

" 'Where the waiver relied on is constructive, or merely implied from the conduct of a party, irrespective of what his actual intention may have been, it is at least questionable if there are not present some of the elements of estoppel.' 31 C.J.S. Estoppel, § 61." (Wright v. Wagner, 1943, 182 Md. 483, 491, 34 A.2d 441, 446. Cf. Chesnut, J., in Manufacturers Casualty Insurance Co. v. Roach, supra, 25 F.Supp. at page 853).

(a) Estoppel as a defense raised by defendant West.

█ That one cannot profit from his own wrongdoing is clear (Ridgeley v. Crandall, 1853, 4 Md. 435, 441, 443; War Emergency Co-op Ass'n v. Widenhouse, 4 Cir., 1948, 169 F.2d 403, 407, certiorari denied 1948, 335 U.S. 898, 69 S.Ct. 300, 93 L.Ed. 433; Scarborough v. Atlantic Coast Line Railroad Co., 4 Cir., 178 F.2d 253, 259, 15 A.L.R.2d 491, certiorari denied 1950, 339 U.S. 919, 70 S.Ct. 621, 94 L.Ed. 1343). Directly on point is New York Life Insurance Co. v. Odom, 5 Cir., 1937, 93 F.2d 641, at page 644, certiorari denied 1938, 304 U.S. 566, 58 S.Ct. 948, 82 L.Ed. 1532, in which the court held:

"Since the insured furnished false evidence which was relied upon by the insurance company, he was guilty of fraud in law which would avoid the policy, whether he was in good or bad faith and whether he intended to deceive or not. [citations omitted] It is elementary that one who is guilty of fraud cannot urge estoppel against the other party to the contract for the purpose of making his fraud effective."

This principle is likewise supported by dictum in Eureka-Maryland Assurance Corp. v. Santo Scalco, supra, 158 Md. at page 77, 148 A. at page 269, and by the holding in Metropolitan Life Insur-

---

22. Reliance is evidenced by the applications to the extent that the asking of certain specific questions therein is corroborative of the testimony of the witnesses Stearns, Walton and O'Neill. See footnote 4, supra.

ance Co. v. Samis, 1937, 172 Md. 517, 524, 192 A. 335.

(b) Estoppel as a defense available to the injured defendants.

 Ordinarily an injured person has no better or different rights under the policy than the insured (United States Fidelity & Guaranty Co. v. Williams, 1925, 148 Md. 289, 300, 129 A. 660; Seaboard Mutual Casualty Co. v. Profit, 4 Cir., 1940, 108 F.2d 597, 598, 126 A.L.R. 1105; Farm Bureau Mutual Automobile Insurance Co. v. Hammer, 4 Cir., 1949, 177 F.2d 793, 801, certiorari denied Beverage v. Farm Bureau Mut. Ins. Co., 1950, 339 U.S. 914, 70 S. Ct. 575, 94 L.Ed. 1339; Hoosier Casualty Co. of Indianapolis, Indiana v. Fox, D.C.N.D.Iowa 1952, 102 F.Supp. 214, 239). Assuming, *arguendo*, that there may be cases in which by estoppel an injured person may have rights superior to those of the insured as against the insurer, this is not such a case. There is absolutely no evidence whatsoever that the injured defendants have been misled to their prejudice or into an altered position, an indispensable element of estoppel.

(c) Waiver.

As to the defense of waiver, it is held on the authorities cited above that the injured defendants stand in the same position as defendant West.

 The court has already indicated in this opinion that it has found as a fact that plaintiff did not at any time prior to March 21, 1955 have actual knowledge of the misrepresentations made to West.

"Ordinarily the knowledge of the insurer must be actual; it is not enough that he might, by inquiry, have learned the facts.[23] But if he has knowledge of facts from which the existence of a breach of condition could be readily inferred, he will be deemed to have such knowledge of the resulting defense as to render acts done under provisions of the policy a waiver of that defense."[24] (Vance on Insurance, 3rd Edition, sec. 83, p. 495–496) "Illustrations are found in the decided cases in which the insurer, although not in possession of full information, had knowledge of facts of such a character as to suggest to a prudent person the need for further investigation into the insurability of the applicant. [Citations omitted] But, on the other hand, it has been frequently held that the mere fact that the insurer has knowledge that some of the statements in an application are incorrect does not of itself put the insurer on inquiry, and charge it with knowledge of all the facts that an inquiry would disclose.[25] [citations omitted] In each instance the character of the information possessed by the insurer determines to which class the case belongs." (Provident Life & Accident Insurance Co. v. Hawley, 4 Cir., 1941, 123 F.2d 479, 482–483).

In the instant case the defendants rely on the insurer's knowledge of one fact to establish waiver—knowledge that its insured had been charged with,[26] or convicted of,[27] reckless driving. Consider-

23. Allegre's Adm'rs v. Maryland Insurance Co., 1836, 8 Gill & J., Md., 190, 200; Mutual Fire Insurance Co. in Baltimore County v. Deale, 1861, 18 Md. 26, 50; Reynolds v. Mutual Fire Insurance Co. of Cecil County, 1871, 34 Md. 280, 288–289. Turnbull v. Home Fire Insurance Co., 1896, 83 Md. 312, 323, 34 A. 875.

24. Manufacturers Casualty Insurance Co. v. Roach, D.C.D.Md., 1939, 25 F.Supp. 852, 854, 855.

25. See also: Ettman v. Federal Life Insurance Co., 8 Cir., 1943, 137 F.2d 121, 127.

26. Handy's reports of October 21, 1954 and March 22, 1955 as well as his testimony during trial of case.

27. Handy's second of three statements in his pre-trial deposition of June 1, 1956, supra, footnote 17.

ing just this one fact, it was as reasonable to assume that the reckless driving took place after the insurance was applied for in March and April of 1954 as it would have been to assume that it occurred prior to the submission of the applications, thus avoiding the policies.

The defendants' entire argument seems predicated on the assumption that an insurer acts at its own peril if it does not proceed on the theory that its insured is dishonest rather than seeking to fulfill its contractual obligations to defend and to indemnify the insured. Handy testified that in his original interview with West he was endeavoring to elicit information that might indicate a possible defense for West to the negligence claims which would undoubtedly be made against him. Handy was not, as West now argues he should have been, investigating to find defenses available to the insurer as against its own insured. Considering the other facts known to the plaintiff it was reasonable to assume or infer there was no fraud involved on the part of West. According to the routine report dated September 1, 1954 of an independent investigating agency, West had "competent driving habits", was not "criticized for drinking" and had no known accidents, losses or arrests. West was a resident of Maryland. Any inquiry addressed to the Maryland Department of Motor Vehicles would have shown that prior to the accident on October 16, 1954 West held an operator's license and registration card, and had no record of either traffic charges or convictions against him. Moreover the word "accident" used in the applications and the words "reckless driving" used by the defendant are not identical. Section 174 of Art. 66½, Code of Public General Laws of Maryland, 1951 Edition, indicates reckless driving may comprise speeding, unreasonable damage to highways by lack of due regard to wear, as well as any reckless operation of a motor vehicle, or operation in such a manner as to endanger life, limb, or property. Accident, on the other hand, while not specifically defined, when used in those sections dealing with operation of vehicles on the highway, relates solely to occurrences actually resulting in death, or personal injury or property damage (Art. 66½ of Code of Public General Laws of Maryland, 1951 Edition, as amended, sections 163, 164, 167). Turnbull v. Home Fire Insurance Co., supra, 83 Md. at page 323, 34 A. at page 876, held that even where a fact known to an insurer constituted an " 'awakening circumstance,' yet that mere fact was not sufficient to relieve the insured (or his agent) from his obligation", said obligation being "(1) to state to the insurer every fact relating to this insurance and the subject thereof, and (2) to read his policy * * * ." In the instant West's obligation was to answer truthfully the questions specifically asked him and to read the applications signed by him.

The court finds the character of information possessed by the insurer insufficient to charge it with knowledge of defendant West's misrepresentations.

Without knowledge of the existence of a possible defense, the payments made to West under the second policy and the cancellation of said policy do not constitute a waiver of the plaintiff's right to rescind. The mere filing by the insurer of an S.R. 21 form as evidence that an automobile liability policy was in effect at the time of the accident, as distinguished from the filing of a certification of a policy as proof of financial responsibility, does not preclude the insurer from exercising its right later to rescind if at the time of the filing the insurer did not have such knowledge of the resulting defense as to constitute its act a waiver of that defense and in the absence of conduct sufficient to raise an estoppel. (Farm Bureau Mutual Automobile Insurance Co. v. Hammer, 4 Cir.,

1949, 177 F.2d 793, 796–798, certiorari denied Beverage v. Farm Bureau Mut. Ins. Co., 1950, 339 U.S. 914, 70 S.Ct. 575, 94 L.Ed. 1339; Hoosier Casualty Co. of Indianapolis, Indiana v. Fox, D.C. N.D.Iowa 1952, 102 F.Supp. 214, 238–240; Art. 66½, sections 114 et seq. of the Code of Public General Laws of Maryland, 1951 Edition, as amended).

Of course, the insurer "must proceed without unreasonable delay after the fraud is discovered to rescind the contract, and to manifest its determination to the other party. Delay, after discovery of the fraud * * *, will furnish evidence that it had decided to affirm the contract." (Stiegler v. Eureka Life Insurance Co., 1925, 146 Md. 629, 642, 127 A. 397, 402). On March 21 or March 22, 1955, the plaintiff first learned of West's misrepresentations. On March 25, 1955 plaintiff notified West of its knowledge and that any action taken by it in continuing to investigate any matter growing out of the accident was not to be considered a waiver of its right to deny liability. From March 21, 1955 until April 25, 1955, the date of notice of rescission, the plaintiff conducted a thorough investigation of the facts in issue in this case and referred to counsel for advice the question as to the legal soundness of its subsequently taken position. There is no showing that any one of the defendants was prejudiced thereby. The court holds that the plaintiff acted with the promptness necessary for rescission (Fountain & Herrington, Inc., v. Mutual Life Insurance Co. of N. Y., 4 Cir., 1932, 55 F. 2d 120, 125–126; Thomas v. Prudential Insurance Co. of America, 4 Cir., 1939, 104 F.2d 480, 483).

For these reasons, and on the foregoing opinion which embodies the essential findings of fact and conclusions of law, the court will enter judgment that policy No. 280 425-C02-20 issued by plaintiff to defendant West has validly been rescinded by plaintiff, and that plaintiff is not liable thereunder.